TALIAFERRO, Judge.
Plaintiff’s left index- finger was severely injured, and the middle finger of the same hand was slightly injured when they came in contact with a running cut-off saw of the mill of defendant, Red River Veneer Company, her employer, on December 28, 1948. She was at once carried to a hospital where both fingers were treated, but after effort by competent physicians until January 14, 1949, to save the index finger, it was found necessary to amputate it. She was six days later, discharged from the hospital. The employer’s insurer, Consolidated Underwriters, of Kansas 'City, Missouri, paid to her compensation at the rate of $15.60 per week until December 13, 1949, and for a period thereafter as shall be hereinafter discussed.
On October 11, 1949, plaintiff filed this suit against 'her employer and its said in *56 surer to recover compensation at said rate for four hundred weeks, less payments made, on the theory that from the effects of said accident and said operation, she had been rendered permanently totally disabled to do work of any reasonable character. She alleged that because of the loss of said index finger and stiffness of the middle finger, she has lost entirely the use of her left hand and is now unable to perform the sort of labor she was performing when injured; that she suffers pain and swelling in the hand; that she is uneducated and can earn a livelihood only by manual labor.
Defendants admit the happening of the accident and injury to plaintiff’s fingers, as alleged, and amputation of the index finger. They allege that the injuries responded to treatment and that she has recovered complete use of the hand and now suffers no disability to that member other than that which has ensued from the loss of the amputated finger. They aver that they have paid all doctors’, hospital and medical expenses incurred in treating plaintiff’s injuries.
On December 5, 1949, the case was taken up for trial and considerable- testimony of medical experts and others was adduced. The trial was concluded and the case was submitted with each side given the right within a fixed time to file brief.
Plaintiff testified that the end of the middle finger was very sensitive, and gave so much .pain that she was unable to use the hand at all. The physicians disagreed as to whether there existed clinical conditions of this finger to justify the complaints made by the plaintiff. Before judgment was rendered in the case, the parties, through counsel, subscribed to stipulations having for their primary objective an operation on plaintiff’s middle finger to relieve, if possible, the conditions therein that were causing her disability. It was agreed by the defendants that they would pay plaintiff compensation at $15.60 per week until December 13, 1949, subject to a credit of twenty payments theretofore made.- She agreed to submit to an operation for the relief of said middle finger within a time to be fixed by the Court, by a physician of her own choosing. Defendants further agreed to pay the expenses of said operation; that no -compensation would be paid after December 13, 1949, unless the operation was performed by that time, and that if performed, defendants would pay not less than two weeks compensation thereafter. It was further stipulated that on application of either side to the suit, testimony shall be adduced “upon the results of the operation at any time after compensation payments to plaintiff by defendants are stopped subsequent to plaintiff’s undergoing the operation on her left hand.”
The ¡Court rendered an order in keeping with and to carry out the terms of the stipulation.
On February 14, 1949, Dr. Barber of Alexandria, Louisiana, at plaintiff’s election, operated upon her finger, and on June 8, 1950, additional testimony was adduced as was provided in the stipulations.
Judgment was rendered in plaintiff’s favor for 56 weeks’ compensation, subject to credit for that number of weeks that had been paid by defendants. Costs to January 24, 1950 were taxed against defendants and those accruing thereafter were assessed against plaintiff. Plaintiff appealed.
Dr. Barber called by plaintiff’s counsel, testified that when the index finger was removed a portion of the head of the metacarpal bone of the middle finger was also removed; and further testified, viz.: “The reason for the operation that I performed was that there was a sharp spicule of bone at the end of the head of this metacarpal bone and she complained of pain whenever she grasped any obj ect and closed her hand. The diagnosis prior to operation was the sharp end of the metacarpal bone with inadequate tissue flap, with probable inclusion of the nerve in the scar tissue. The operation consisted of opening the hand along the inner surface ov-er the metacarpal bone, exposing the head of the metacarpal and amputating from one-half to three-quarters of an inch of the head of the bone. The in-terphalangeal nerve was found to be incarcerated in the scar tissue. This nerve *57 was separated and severed about a half to three-quarters of an inch, proximal that is further up the hand. This gave her an ample flap ■ coverage over the end of the metacarpal bone. That completed the operation.”
The conditions found by Dr. Barber at the end of the middle finger confirmed the prior diagnosis of Dr. Banks, and, he says, supported plaintiff’s complaints of • pain therein when she grasped any object. He estimated that loss of an inflex finger reduces complete functioning of the hand from twenty to twenty-five per cent. He also testified that .although the loss of the index finger has impaired the full use of the hand, “it hasn’t prevented her from doing that kind of work”. This refers to the work plaintiff was doing when injured, the details of which Dr. Barber fully understood.
At the suggestion of plaintiff’s counsel and of the Court, Dr. Barber examined in Court plaintiff’s left hand, and thereafter testified as follows, to wit:
“Q. Doctor, you have looked at Alberta Williams’ hand now? A. Yes, sir.
“Q. Does the scar seem to have healed over? A. Yes, sir.
“Q. Can you tell anything about how soon she should recover the normal use of the hand? A. She has use of the remaining fingers. The hand is healed. Of course, there is total loss of the left index finger, which is, we all know, permanent.
“Q. Has she, due to lack of exercise and use, lost any power in her hand? A. Yes, there is some loss. She has right good strength but it is not as strong as the other hand is.
“Q. Do you think in time with the proper exercises she will recover strength in the other three fingers? A. Yes, sir.
“Q. At the present time she has not recovered it? A. No, not completely.”
On cross-examination, he testified:
“Q. Doctor, your operation then successfully removed the bone and the nerve that was causing her pain at the point of amputation prior to the operation? A. That is correct.
“Q. As a result of this operation, does she have any disability other- than the loss of the left-index finger? A.- No.”
******
“A. She has a hand there that has lots of potential use. Lots of use now. It is a matter of wanting to work. We have all seen handicapped people with a lot worse hand than she has that do a full day’s work.
“Q. In other words, other than the fact that she lost a finger, she has no further handicap; is that correct? A. Yes, sir.-
“Q. And- she could carry on her duties with the loss of that finger? Necessarily there is a certain percentage of disability when a finger goes? A. Oh, yes. -
“Q. Other than that she can carry on her work as well as she could before? A. Yes, sir.
“Q. Then since the operation you think she is in good shape, other than the loss of that finger? A. Yes, sir.”
He further amplified his testimony -by saying that lack of the use of the remaining fingers weakened them to some extent and added: “but that -can be very easily overcome by working and exercising” the hand and fingers for not longer than one month, and thereafter the fingers would be as strong as ever.
Dr. T. E. Banks was called by plaintiff when the case was first heard, and by the defendants at second hearing. As said before, his diagnosis of plaintiff’s middle finger (prior to the operation) was found correct by Dr. Barber. In his last testimony he unequivocably stated that the operation successfully removed the disability of which plaintiff originally complained, and that now she could efficiently perform the sort of work she was performing when the accident occurred. He also well understood the character of this work; in fact, went to the mill, closely observed the cut-off saw, and personally put it in motion in order to sever some pieces of veneer boards, such as plaintiff’s duties required her to handle.
At the second hearing, plaintiff again took the witness stand. Presumably, the pain and discomfort present when she first *58 testified, had ceased as she said nothing about them while testifying at this time. The only disability she then asserted was that her left hand was not strong enough to “hold the boards and run the saw through them”. It is shown by her testimony and that of other witnesses that after the boards were deposited, one upon another, upon a table, the swinging saw was moved by the right hand to the spot on the side of the pile of boards where it was desired that they be sawed through.
Mr. Tousek, manager of the Red River Veneer Company, fully explained the nature and mechanics of the work plaintiff was doing when hurt. It was her duty to stand by a table and receive from rollers faulty pieces of veneer % of an inch thick, not over 12 Y2 inches wide, and from 33 inches to 49 inches long. Mr. Tousek testified as follows, viz.: “The boards develop on a lathe, of course, and drop on to a table which has live conveyor belts, and it proceeds down the table and the defective pieces are lifted off by workers, that we call ‘graders’, and set on to rollers on the side. They are not live rollers; they simply roll on the bearings. The material piles up and is pushed toward the operators of the saw. There is then a grader in there who selects the boards and stacks them in the order that is best suited to getting the most from that board, and the operator of the saw picks those off in handsfuls and levels them up and puts them through a saw.”
The operator of the saw lays the pieces of veneer on top of the table with one end against an iron stop and the farther side against a back stop not over five inches high. After the pieces, of a combined thickness of not over five inches, are fitted into the angle formed by the two stops, with faulty ends to the operator’s right, the swinging saw is applied to the stack and cuts off the faulty ends. The saw is controlled and directed by the right hand while the left hand is pressed against the left end of the stack. After the ends have been cut off by the saw, the operator again picks up the merchantable parts of the boards and stacks them near by.
It is obvious that the work done by the plaintiff was not heavy. It did not require a maximum of physical exertion. The combined weight of the stacks of •boards did not exceed thirty pounds, and it was not necessary that she at any one time lift the entire stack. It is true that to lift the boards from the rollers onto the table and therefrom it could be done by grasping them with both hands, but this was not absolutely necessary if the boards were handled singly or two at a time. When more than one was lifted, it required small assistance from the left hand to the right to successfully perform the operation.
We are unable to perceive wherein plaintiff’s ability to perform her former duties as saw operator has been materially impaired. It is common knowledge that persons who have lost an index finger, especially of the left hand, have little difficulty in securing gainful employment and experience very little inconvenience in satisfactorily discharging the duties of such employment.
It is our view that the provisions of the Workmen’s Compensation Law that fix the rate and’period of compensation for the loss of an index finger has application to this case. Section 8, Subsection 1(d) 2, Act No. 20 of 1914, as amended, Act No. 242 of 1928, p. 357. This law declares for the loss of such a finger the compensation payments shall be 65% of weekly wages for a period of thirty weeks. Plaintiff, however, on account of the agreement herein-above mentioned, has been paid for nearly twice the period fixed by law.
Plaintiff cites and relies upon Young v. Central Surety & Insurance Corporation, La.App., 41 So.2d 700, and Hughes v. Enloe, 214 La. 538, 38 So.2d 225. The facts of these cases are not parallel with those of the case at bar. Of course, in cases of this character the facts of each case necessarily determine whether the specific injury provisions or other provisions of the Workmen’s Compensation Law apply.
The case of Anderson v. H. & H. Machine Shop, La.App., 32 So.2d 115, 118, *59 decided by our brothers of the First Circuit, is on all-fours with the present one. It is said therein: “The test of disability under the [Workmen’s Compensation Act] is whether an employee can discharge the duties of the occupation he held at time of injury. * * * Applying that test to the present case, plaintiff cannot recover.”
In that case the plaintiff had lost by •amputation an index finger.
For the reasons herein assigned, the judgment from which appealed, is affirmed with costs.